**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| In re: ) | |
| ) | |
| Kristy J. Winslow (now Curtis), ) | Chapter 7 |
| ) | Case No. 96-10791 |
| Debtor ) | |
| _____ ) | |
| Kristy J. Winslow (now Curtis), ) | |
| ) | |
| Plaintiff ) | Adv. Proc. No. 04-1078 |
| ) | |
| v. ) | |
| ) | |
| Salem Five Mortgage Co., Inc., ) | |
| ) | |
| Defendant ) | |
| _____ ) | |

**MEMORANDUM OF DECISION**

Kristy J. Curtis is seeking damages from Salem Five Mortgage Co., Inc. ("Salem") on the one remaining count of her amended complaint for violations of the discharge injunction found in § 524(a)(2).[1] Count II was dismissed with prejudice by agreement of the parties due to lack of jurisdiction. Before me is Salem's motion for summary judgment. It is undisputed that Salem issued credit reports after Curtis' discharge showing her to be an obligor on the mortgage debt assumed by her former husband in their divorce. Also, it is undisputed that Curtis received at least one notice of default on the mortgage debt after her discharge. Yet, despite those actions, Salem's motion will be granted because there has been no showing of a willful attempt to collect the mortgage debt as a personal liability.

This memorandum contains my findings of fact and conclusions of law pursuant to FED.

---

[1] Unless otherwise indicated, all references to statutory sections are to the Bankruptcy Reform Act of 1978 ("Bankruptcy Code" or "Code"), as amended, 11U.S.C. § 101 et seq.

R. BANKR. P. 7052.  My findings of fact are derived from the stipulations of the parties, their affidavits, and other evidence introduced on the motion.

## Background

While living as a married couple in 1993, Curtis and her former husband, William Pratt, jointly purchased residential real estate in Stockton Springs.  Their acquisition was financed with a mortgage loan from Camden National Bank ("Camden").  Curtis and Pratt were divorced by judgment dated May 3, 1996.  The divorce judgment set aside the residence to Pratt and made him solely responsible to Camden on the mortgage indebtedness.[2]  At that time, an abstract of the divorce judgment was recorded at the registry of deeds.  Curtis did not send a copy of the abstract to Camden; nor did she execute a deed in favor of Pratt or execute new loan documentation to alter her status as a borrower.  There is nothing in the record showing if, or when, Camden became aware of the divorce court's disposition of the Stockton Springs property beyond Curtis' contention that she advised Camden by telephone that, as a consequence of the divorce, she would not be living there and that Pratt would be responsible for paying the debt.

The Maine statute governing property transfers in divorce at that time provided, in relevant part, that "(t)he recording of the decree or abstract of the decree has the force and effect of a quitclaim deed releasing all interest in the real estate described in the decree or abstract of the decree, whether the interest is in fee or by statute." 19-A M.R.S.A. § 953(7).  Consequently, when Curtis filed her chapter 7 bankruptcy case on July 29, 1996, she had no interest in the Stockton Springs property; and, despite the divorce and Pratt's assumption of the mortgage debt

---

[2] Paragraph 2 of the stipulation of facts states that the divorce judgment shifted responsibility for the mortgage debt to Pratt.  Paragraph 3 states that his sole responsibility is attributable to an oral agreement.  Either way, it is agreed that Pratt had assumed sole responsibility for the mortgage debt.

and the indemnity implied by that assumption, Curtis' obligation to Camden remained intact. These realities were accurately reflected on her bankruptcy schedules: The Stockton Springs property does not appear on Schedule A; Camden appears on Schedule D as the holder of a claim secured by a mortgage; and, to complete the picture, Pratt shows up on Schedule H as a co-debtor on the Camden debt.

On August 28, 1996, one month after the filing of the bankruptcy case, Camden notified Curtis and Pratt that the mortgage loan had been transferred to Salem. Curtis never amended her schedules to reflect that transfer. At the time of her discharge on October 22, 1996, Camden remained the only scheduled creditor with a mortgage on the property.

Curtis was aware that Salem had acquired the Camden mortgage in August, 1999, when she began a fourteen to sixteen month effort to reconcile with Pratt. During that period, she made several, voluntary, post-discharge payments to Salem on the mortgage from funds drawn on her own account.

Between mid-1999 and late 2003 Salem sent several notices of default to Pratt and Curtis. These notices were delivered via certified, first class mail to "William J Pratt and Kristy J Pratt [Curtis] at RR 2, Box 61, Stockton Springs, ME 04981-9705." Although Curtis may have been living with Pratt at some time during this period, the only notice of default she received is the one dated February 2, 2001. According to Curtis, she was not living with Pratt at the time of that notice. At her deposition Curtis stated that it had been sent as certified mail by the post office to her residence at Searsport, Maine. The exhibit containing the February 2, 2001, notice shows only the Stockton Springs address. After May, 2003, Curtis directed Salem to send her copies of all default notices. Salem complied with her request.

Curtis also asserts that several applications for loans were denied by various lenders between 1998 and 2004, including Key Bank and GMAC in November, 1998. Curtis attributes these denials to inaccurate information sent by Salem to credit reporting agencies about her continuing obligation on the mortgage; but she has offered no evidence, beyond her own conclusions, showing why her applications were denied. The written Key Bank and GMAC rejections give no specific reasons for the denial of credit. The GMAC notice refers to the Experian credit reporting agency as the source of information. The Experian report of December 7, 1999, is in evidence. Along with many entries with debts before and Curtis' bankruptcy, it shows the following: her bankruptcy, a former joint obligation with Pratt owed to Camden, and a joint obligation with Pratt owing to Salem in the amount of $61,105.00 as of October, 1999. The status of the Salem debt is "open/current, was past due 30 days."

Camden denied Curtis credit in November, 2000. The written denial in evidence lists several reasons, including insufficient income, excessive obligations, delinquent past or present obligations, garnishments, attachments, foreclosure, repossession, collection action or judgment, and bankruptcy.

Curtis insists she that she began speaking to Salem's representatives regarding the manner in which Salem was presenting the Stockton Springs mortgage debt on her credit report between April 2001 and the time she acquired her own home in October, 2001. During this period, Curtis claims to have transmitted to Salem, by electronic facsimile, information concerning her bankruptcy, discharge, and divorce. Curtis offered no written evidence to corroborate her memory of the timing of these events. Salem acknowledges hearing from Curtis, but insists these communications took place about one year later in October, 2002. There is a

credit report from Experian dated August 13, 2001, showing Kristy J. Pratt as the obligor on an "open" account with a balance due as of August 1, 2001, of $58,957, but that report does not help establish when Salem became aware of Curtis' post-divorce, post-bankruptcy status. It is agreed that Salem reported Curtis as having an account "open" and 30 days late both before and after it learned of her discharge. Also, it is agreed that the definition of an "open account" for credit reporting purposes is "an account that is active, still in use or still being paid."

Curtis acquired her home in October, 2001, on her own with a mortgage loan obtained without any co-obligors. According to credit reports on this mortgage, Curtis was once late by sixty days and was late fifteen times by thirty days.

Credit was denied Curtis by Sam's Club in May, 2003. Around June 6, 2003, Curtis had an exchange of correspondence with Virginia Browder of Salem. These letters and e-mails show: Curtis believed that she was not responsible for the Stockton Springs mortgage; she knew her name appeared on the mortgage account; she wanted to receive copies of all correspondence on that account at her Searsport address; she wanted to monitor Pratt's payments on the Stockton Springs mortgage because of their effect on her credit; and she wanted to ensure that Pratt made timely payments if he was not able to refinance.

On or about June 11, 2003, Curtis filed a written complaint against Salem with the State of Maine Office of Consumer Credit Regulation ("MOCCR") because of Salem's refusal to remove the mortgage account from her credit report. MOCCR wrote to Salem about Curtis' complaint, and asked that Salem respond to Curtis' concerns. Salem responded to MOCCR by letter dated June 27, 2003, explaining that Curtis and Pratt were joint obligors, and that it had not contacted Curtis for payment on the loan, although it had recently agreed, at Curtis' request, to

send copies of account statements and correspondence to Curtis so that she could monitor the payment history. Salem also explained that while Curtis' obligation on the loan had been discharged in her bankruptcy, the discharge did not include removal of the information from Curtis' credit bureau report. MOCCR, by letter dated January 5, 2005, responded to Salem's letter, disagreeing with Salem's conclusion concerning removal of the information. MOCCR asserted that someone reading Curtis' credit report would likely conclude that she is still liable on the debt. MOCCR also asked Salem to stop its reporting to the credit reporting agencies.

Curtis was denied credit by Camden again in January, 2004. The reasons given were: "primary applicant failed to qualify","bankruptcy", "delinquent past or present credit obligations with others", and "collection account(s) and/or charge-off account".

Pratt refinanced the Stockton Springs mortgage, paying Salem in full in March of 2004. Curtis' Experian credit report dated October of 2004 shows the Salem account, as of March of 2004 as "Paid/Current, was past due 30 days." Her TransUnion report, also dated October of 2004, shows the Salem account, as of September, 1999, as "Paid or paying as agreed." An Equifax report from that same month does not reference a Salem obligation, but reports a Camden loan, as of October of 1997, as "Pays as agreed."

## Discussion

**Summary Judgment**

Summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). "The plain language of Rule 56(c) mandates the entry of

summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case . . . ." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. Nicolo v. Philip Morris, Inc., 201 F.3d 29, 33 (1st Cir. 2000). Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." Triangle Trading Co. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); FED. R. CIV. P. 56(e).

There are disputed facts in this case. These disputes center on when Curtis advised Salem of her discharge and the extent to which Curtis was harmed, if at all, by Salem's actions. But, leaving these disputes unresolved will not preclude summary judgment. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." Casas Office Machines, Inc. v. Mita Copystar America, Inc., 42 F.3d 668, 684 (1st Cir. 1994)(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)).

**The Discharge Injunction**

Section 524(a)(2) provides, in relevant part, that a discharge operates as an injunction against the commencement or continuation of an action, the employment of process, or an act to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived. . . ." There are no specific enforcement or penalty provisions in § 524 for a violation of this injunction, but § 105(a) may be employed in conjunction with §

524 to fashion appropriate relief for a violation of the discharge injunction, including an award of monetary damages for civil contempt. See Bessette v. Alvo Financial Services, Inc., 230 F.3d 439, 444-445 (1st Cir. 2000), cert. denied, 532 U.S. 1048 (2001).

The discharge injunction, when coupled with the bankruptcy court's contempt powers, puts teeth in the so-called "fresh start" doctrine. See F.C.C. v.NextWave Personal Communications, Inc., 537 U.S. 283, 314 (2003); Pratt v. G.M.A.C. (In re Pratt), 324 B.R. 1, 5 (Bankr. D. Me. 2005). Without the discharge injunction, debtors would remain at the mercy of their pre-bankruptcy creditors. Yet, as purposeful and powerful as the discharge injunction may be, it is limited in scope and may not be employed as a source of damages unless there has been an act to collect a pre-bankruptcy claim from a debtor as a personal liability. If this essential element is missing, there will be no violation of the discharge injunction no matter how egregious or otherwise actionable the misdeeds of a creditor may have been. To establish this essential element at trial, a debtor must demonstrate by a preponderance of the evidence that "the offending creditor knew of the bankruptcy discharge and took willful action in violation of the discharge injunction." Pratt, 324 B.R. at 5.

Curtis claims that Salem violated the discharge injunction by (a) publishing erroneous credit reports and (b) sending her a notice of default.

**(a)    The Credit Reports**

It is agreed that Salem reported Curtis' obligation on the Stockton Springs mortgage as "an open account 30 days late" before and after being notified of her bankruptcy discharge. The reports issued by Salem before it became aware of the discharge are not violations of the discharge injunction because, without knowledge, Salem's acts could not be actionable under

8

§ 524. See Pratt, 324 B.R. at 5.

After Salem became aware of the discharge, its credit reporting was willful activity and its reports were less than accurate. Curtis has shown that she was denied credit several times and that those denials may have been due, at least in part, to Salem's inaccurate reports. However, the willful act of publishing erroneous credit reports is not, by itself, enough to implicate § 524, even if that act is repeated and causes injury. To have avoided summary judgment on this aspect of her case, Curtis would have had to have shown there to be a genuine issue of material fact for trial on the essential element of her case that Salem's credit reports were issued to persuade her to pay the mortgage debt as a personal liability. See Celotex, 477 U.S. at 322. Curtis' offer of the credit reports themselves and the denials of credit is not enough to set up a genuine issue of fact on the essential element of her claim.

Salem's rebuttal evidence on this aspect, the affidavit of Virginia Browder, states that Salem's reporting of a claim against Curtis was not an attempt to compel her to pay the mortgage debt. That self-serving affidavit has been ignored without consequence because there is no requirement that a moving party on summary judgment "support its motion with affidavits or other similar materials *negating* the opponent's claim." Celotex, 477 U.S. at 323 (emphasis in original).

**(b)   The Default Notice**

The default notices sent by Salem from mid-1999 to late 2003 fall into three categories: those sent to the Stockton Springs address that were not received by Curtis; the one received by Curtis dated February 2, 2001; and those sent to her at her request after May 2003. The only notice that could be a violation of the discharge injunction is the one dated February 2, 2001.

The notices that Curtis did not receive are of no concern; and those that she asked for were sent by Salem to honor her request to monitor Pratt's performance on the mortgage obligation. Curtis knew when she received them that Salem was not pressing her for payment. See transcript of Curtis deposition, p. 45

The February 2, 2001 notice of default is clearly evidence of an act to collect a debt; although it is less than certain that it is an attempt to collect the mortgage debt in question from Curtis as a personal liability. One could construe it to be notice of an intention to pursue nothing more than foreclosure, in which case collection of a deficiency, if any, as a personal liability from Curtis would come at a later time. Another reading would be that even the threat of foreclosure alone could be taken by a debtor to be an attempt to collect a debt as a personal liability. However, under the present circumstances it will not be necessary for me to determine the nature and extent of the collection activity shown by this notice because, at the time it was sent, Salem was unaware of Curtis's discharge. A willful violation of the discharge injunction requires knowledge of the discharge. See Pratt, 324 B.R. at 5. Such knowledge is an essential element of Curtis' claim to be established in response to a motion for summary judgment if there is to be a genuine issue of material fact for trial. See Celotex, 477 U.S. at 322.

Curtis's argument that Salem learned of her discharge as a consequence of its acquisition of the mortgage debt from Camden in August of 1996 is not persuasive. The facts before me show that acquisition of the loan by Salem occurred one month after Curtis filed bankruptcy, that Camden was listed on Curtis' schedules as the holder of a secured claim, and that Pratt was listed as a co-debtor. But, there is nothing in the record to show that Salem had acquired knowledge of Curtis' bankruptcy or her discharge. From the evidence, the earliest Salem might have received

actual knowledge of Curtis' bankruptcy and discharge would have been between April, 2001 and October, 2001, when Curtis claims to have given this information to Salem. Thus, the notice of default dated February 2, 2001 was sent by Salem to Curtis before the earliest time she claims to have informed Salem of her bankruptcy and her discharge. Therefore, knowledge of the discharge, an essential element of a violation of the discharge injunction, is missing.

### Conclusion

Curtis has failed to establish a genuine issue of material fact for trial on each of her two claims for violation of the discharge injunction. Salem's motion for summary judgment is granted. A separate order will issue.

DATED: March 21, 2006

_____
Louis H. Kornreich, Chief Judge
United States Bankruptcy Court

11