**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| Kristy J. Winslow (now Curtis), | ) | Chapter 7 |
| | ) | Case No. 96-10791 |
| Debtor | ) | |
| _____ | ) | |
| Kristy J. Winslow (now Curtis), | ) | |
| | ) | |
| Plaintiff | ) | Adv. Proc. No. 04-1078 |
| | ) | |
| v. | ) | |
| | ) | |
| Salem Five Mortgage Company, LLC | ) | |
| | ) | |
| Defendant | ) | |
| _____ | ) | |

**MEMORANDUM OF DECISION**

Kristy J. Curtis seeks damages from Salem Five Mortgage Company, LLC ("Salem") on her amended complaint for violation of the discharge injunction of § 524(a)(2).[1] Her claim is based upon allegations that Salem published inaccurate credit reports and issued improper default notices. This is the second time this matter is before me. In the first go-around summary judgment was awarded to Salem. The Bankruptcy Appellate Panel for the First Circuit reversed that judgment on appeal by Curtis and remanded the case for further action consistent with the decision of the First Circuit Court of Appeals in <u>Pratt v. Gen. Motors Acceptance Corp. (In re Pratt)</u>, 462 F.3d 14 (1st Cir. 2006).

The decision in <u>Pratt</u>, which followed the entry of summary judgment in this case, established an "objectively coercive" standard for determining a violation of the discharge

---

[1] Unless otherwise indicated, all references to statutory sections are to the Bankruptcy Reform Act of 1978 ("Bankruptcy Code" or "Code"), as amended, 11U.S.C. § 101 <u>et seq.</u>

injunction.  Id. at 20.  After trial, it is my conclusion, in light of Pratt, that Curtis is entitled to judgment and damages.

This memorandum contains my findings of fact and conclusions of law pursuant to FED. R. BANKR. P. 7052.

**Jurisdiction**

The district court has original, but not exclusive jurisdiction of all civil proceedings arising under the Bankruptcy Code.  See 28 U.S.C. § 1334(b).  This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O).  As such, it has been referred to this court for final determination.  See 28 U.S.C. § 157(a); D. Me. Civil Rule 83.6(a).  Venue is appropriate under 28 U.S.C. § 1409(a).

**Background**

In 1993, Curtis and her then husband, William Pratt ("Pratt"),[2] jointly purchased a home in Stockton Springs, Maine.  Their acquisition was financed with a joint mortgage loan from Camden National Bank ("Camden").  Curtis and Pratt were divorced in May of 1996.  The divorce judgment gave Pratt the residence and made him solely responsible for the mortgage indebtedness.  There is no evidence showing if, or when, Camden became aware of the divorce court's disposition of the residence beyond Curtis' contention that she advised Camden by telephone that, as a consequence of the divorce, she would not be living there and that Pratt would be responsible for paying the debt.

When Curtis filed her chapter 7 bankruptcy case on July 29, 1996, she had no interest in the residence even though her obligation to Camden remained intact.  Her bankruptcy schedules

---

[2]  William Pratt was not a party in Pratt.

2

reflected the situation. The residence was not shown as property of the debtor, but Camden was shown as the holder of a claim secured by a mortgage and Pratt was listed as a co-debtor on the mortgage.

On August 28, 1996, one month after the filing of the bankruptcy case, Camden sent notice to Curtis and Pratt that the mortgage loan had been transferred to Salem.[3] At the time of her discharge on October 22, 1996, Camden remained the only scheduled creditor with a mortgage on the property.

From mid-1999 until late 2003 Salem sent several notices of default to Pratt and Curtis. These notices were delivered via certified, first class mail to "William J Pratt and Kristy J. Pratt [Curtis] at RR 2, Box 61, Stockton Springs, ME 04981-9705." Although Curtis was living with Pratt during parts of 1999 and 2000, the only notice of default she received is the one dated February 2, 2001. Curtis claims that notice was forwarded to her.

Curtis purchased a home on her own in October of 2001. At that time, she became aware that Salem was still reporting the mortgage loan to credit reporting agencies as an open account. She commenced communications with Salem sometime in late 2001 or early 2002 regarding her concern that Salem was incorrectly reporting the status of the loan.[4] She testified that she communicated several times with Virginia Browder, a Salem representative, during 2002 and

---

[3] Curtis denies receiving notice of the loan transfer when it was sent out. It is not clear when she learned of the loan transfer, although she acknowledges making some payments on the mortgage herself to Salem during 1999 or 2000 while she was reconciled with Pratt.

[4] The exact time during 2002 that Curtis commenced these communications with Salem is controverted. Salem asserts that it was in September of 2002; Curtis believes that it was late 2001 or early 2002, but acknowledges that it could have been as late as September, 2002. So far as the evidence shows, this was the first time that Salem became aware that Curtis had been discharged in bankruptcy.

3

2003.  Although pleasant, Browder refused to change the way that Salem reported the status of the mortgage debt.  Curtis said that Browder's comments were always to the effect that her obligation was "a legally binding contract" or that she still owned the house.

In June of 2003 Browder suggested that Curtis ask Salem in writing to send her copies of all default notices.  The reason Browder suggested this, according to Curtis, was so that Curtis could monitor the status of Pratt's payments to Salem and make sure that Pratt made the payments.  Following Browder's suggestion, Curtis sent Salem a letter requesting copies of all default notices.  Salem complied.

Also in June of 2003, Curtis filed a written complaint against Salem with the State of Maine Office of Consumer Credit Regulation ("MOCCR") because of Salem's refusal to remove the mortgage account from her credit report.  MOCCR was unable to convince Salem to change the way it reported Curtis' liability on the discharged debt.

Pratt refinanced the Stockton Springs mortgage, paying Salem in full in March of 2004.

## Discussion

The discharge injunction, § 524(a)(2) provides, in relevant part, that a discharge "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived."  See Pratt, 462 F.3d.at 17, citing Fleet Mortgage Group, Inc.  v. Kaneb, 196 F.3d 165, 267 n.4 (1st Cir. 1999).  There are no specific enforcement or penalty provisions in § 524 for a violation of this injunction.  "'[A] bankruptcy court is authorized to invoke § 105 to enforce the discharge injunction imposed by § 524 and order damages for the appellant in this case if the merits so require.'"  See Pratt, 462

F.3d at 17, citing Bessette v. Alvo Financial Services, Inc., 230 F.3d 439, 445 (1st Cir. 2000), cert. denied, 532 U.S. 1048 (2001).

Before Pratt it was generally understood that damages for violation of the discharge injunction were available when the creditor knew of the discharge and intended the action which violated the injunction. See Hardy v. United States (In re Hardy), 97 F.3d 1384,1390 (11th Cir. 1996). Pratt builds on that platform. A creditor with the requisite knowledge and intent will be liable for damages if, under an objective test, it has "acted in such a way as to 'coerce' or 'harass' the debtor improperly." See Pratt, 462 F.3d at 19. The inquiry is fact specific. Objective coercion will exist when a creditor's action is threatening in and of itself. "Thus, even legitimate state-law rights exercised in a coercive manner might impinge upon the important federal interest served by the discharge injunction, which is to ensure that debtors receive a 'fresh start' and are not unfairly coerced into repaying discharged prepetition debts."[5] Id. at 19.

Curtis claims that Salem violated the discharge injunction under an objective test by (a) publishing erroneous credit reports and (b) sending her default notices.

**(a)    The Credit Reports**

It is undisputed that Salem reported Curtis' obligation on the residential mortgage as "an

---

[5] The creditor in Pratt held a lien on an inoperable and essentially worthless vehicle. The trustee had no interest in the vehicle and the debtors wanted to be rid of it. The creditor refused to repossess it; and, in accord with state law, the creditor refused to release its lien without payment. The only demand for payment was in rem, but the debtors could do nothing with the vehicle without first satisfying the lien. Until then they couldn't as much as bring it to a junkyard. Without suggesting that a creditor invariably would be in violation of the discharge injunction by insisting on in rem rights under state law, the Court concluded that the creditor's conduct, even if presumed to be in good faith, was coercive and a willful violation of the discharge injunction. See Pratt, 462 F.3d at 19, 21.

open account 30 days late" before and after it became aware of her discharge. The parties agree that an open account is "an account that is active, still in use or is still being paid." Surely, with respect to Pratt, the account was active, in use and still being paid after Curtis' discharge. So, to that extent, Salem's reporting was accurate. But those reports were not accurate with respect to Curtis. They made it appear that her obligation was active after her discharge. Moreover, after learning of Curtis' discharge, Salem took no corrective action. Salem's ongoing refusal to fix the reports was coercive in its effect, as was its insistence that Curtis still owned the house and had a legally binding contract. Thus, Salem's conduct was a violation of the discharge injunction.

Curtis did not show conclusively that she was denied credit as a consequence of the inaccurate credit reports. That failure will limit her damages, but will not affect the occurrence of the violation of the discharge injunction.

**(b)     The Default Notices**

All of the default notices sent by Salem were intentionally addressed to Curtis and Pratt at the residence in Stockton Springs. For the most part Curtis did not live there and did not see them. Like "a tree that falls in a deserted forest . . . ," an action taken by a creditor without a debtor's knowledge can have no threatening effect. However, unlike that legendary tree, a creditor's silent action may become a noisy threat at a later time.

The default notice dated February 2, 2001, was like that famous tree. It was "silent" in its effect because, at that moment, Salem lacked knowledge of Curtis' discharge. In June, 2003, at Salem's suggestion, after Salem had knowledge of the discharge, Curtis asked for and began to receive copies of the default notices. Those copies were addressed to Curtis and Pratt and

matched the earlier versions, including the one dated February 2, 2001.  Those notices were threatening to Curtis and each one demonstrated an intention to violate the discharge injunction.  Curtis' request for copies is not a mitigating factor because, by the time of her request, she was aware of Salem's refusal to acknowledge the cacophonous nature of its actions.

As with the credit reports, Salem's refusal to correct the default notices showed a disregard for Curtis' right to a fresh start.

## Damages

Curtis has offered no evidence of damages beyond her attorneys fees and costs in the amount to $39,384.80.  Those fees and costs are undisputed.  An award of attorneys fees and costs for violation of the discharge injunction is appropriate.  See Bessette, 230 F.3d at 445, ("[B]ankruptcy courts across the country have appropriately used their statutory contempt power to order monetary relief, in the form of actual damages, attorneys fees, and punitive damages, when creditors have engaged in conduct that violates § 524.").  Therefore, judgment shall enter for Curtis and she shall be awarded damages in the amount of $39,384.80.

A separate judgment shall issue.

DATED: July 30, 2008

_____
Louis H. Kornreich, Chief Judge
United States Bankruptcy Court